IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

GERALD WHEALTON,

    Plaintiff,

v.                            No. 05-2234 B

STEVE HUDGINS,

    Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

Before the Court is the motion of the Defendant, Steve Hudgins, to dismiss this action pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. In this personal injury action removed to this Court from the Circuit Court of Shelby County, Tennessee on the basis of diversity jurisdiction, the Plaintiff, Gerald Whealton, seeks damages arising from injuries suffered in an accident involving a semi tractor cab. Specifically, the Plaintiff alleged that

> On or about December 7, 2003, Plaintiff was standing inside the cab of semi-truck being operated by the Defendant, Steve Hudgins. Defendant had previously dropped off the trailer and was operating the semi truck without any trailer connected to it, when suddenly and without warning, Defendant pulled forward and then braked suddenly, causing Plaintiff to fall, striking the windshield and dashboard of the semi cab.

(Compl. at 2.)

In the instant motion, the Defendant argues that subject matter jurisdiction does not exist on the grounds that, as he is the Plaintiff's employer, the Tennessee Workers' Compensation law provides the exclusive remedy. Rule 12(b)(1) permits dismissal of a complaint for "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). "When the defendant challenges



subject matter jurisdiction, the plaintiff has the burden of proving jurisdiction and the court may resolve factual disputes." Robinson v. Ohio, Dep't of Dev., 69 F.App'x 204, 205 (6th Cir. 2003) (citing Rogers v. Stratton Indus., Inc., 798 F.2d 913, 915 (6th Cir. 1986)).

When federal jurisdiction arises from diversity of citizenship, as is the case here, the Court is to look to state law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); Belew v. Lafayette Steel Erector, Inc., No. 92-5560, 1994 WL 51585, at *2 (6th Cir. Feb. 18, 1994). The Tennessee Workers' Compensation statute provides in pertinent part that "[t]he rights and remedies . . . granted to an employee subject to the Workers' Compensation Law on account of personal injury . . . shall exclude all other rights and remedies of such employee . . . at common law or otherwise, on account of such injury . . ." Tenn. Code Ann. § 50-6-108(a) (1999 Repl.). Thus, the statute "requires an employer to compensate an employee for injuries he sustains on the job, even if those injuries are not a result of employer negligence. In turn, the employee is barred from recovering damages from his employer for injuries resulting from his employer's negligence making workers' compensation benefits the employee's exclusive remedy." Lynch v. Nissan North Am., Inc., No. 3-04-0445, 2005 WL 2416379, at *3 (M.D. Tenn. Sept. 30, 2005) (citing Mathis v. Bowater Inc., 985 F.2d 277, 278 (6th Cir. 1993) (internal citations and quotation marks omitted). Accordingly, "the Workers' Compensation Act is a complete substitute for an employee's common law remedies against an employer for work-related injuries." Id. (citing Newman v. National Union Fire Ins. Co., 786 S.W.2d 932, 935 (Tenn. 1990)).

Although the basis for the Workers' Compensation Act is the employer-employee relationship, an individual other than the employee's "regular" employer may be entitled to reap the benefits of the exclusive remedy provisions under certain circumstances. Phillips v.

2

Bridgestone/Firestone, Inc., 772 F.Supp. 379, 383, 387 (M.D. Tenn. 1991). Under the "borrowed servant" or "loaned employee" doctrine, "if it is determined that a worker's regular employer lends him to a 'special employer' to perform certain duties, the special employer can be considered an employer for purposes of worker's compensation." Id. at 387 (citing Winchester v. Seay, 219 Tenn. 321, 409 S.W.2d 378 (1966)).

> In order for an employee to be considered a "borrowed servant," the following three conditions must be met:
>
> (a) The employee has made a contract of hire, express or implied, with the special employer;
>
> (b) The work being done is essentially that of the special employer;
>
> (c) The special employer has the right to control the details of the work.

Id. (citing Winchester, 409 S.W.2d at 381). It is the position of the Defendant that all three factors have been established here.

According to his affidavit, Hudgins was an independent contractor engaged in the business of driving a tractor-trailer. (Def. Steve Hudgins' Br. in Supp. of Mot. to Dismiss for Lack of Subject Matter Juris., Ex. A (Aff. of Steve Hudgins ("Hudgins Aff.") at ¶ 2.) In March 2003 he entered into an independent contractor agreement with Prime, Inc. to haul freight. (Hudgins Aff. at ¶ 3.) Hudgins asserts that Whealton was a Prime employee partnered with him for the purpose of receiving training to be an over-the-road truck driver. (Hudgins Aff. at ¶¶ 7-9.)

Hudgins points to an "Expectation Agreement" entered into between the parties, a copy of which has been provided to the Court, which he contends constitutes an implied contract for hire of Whealton by the Defendant, in satisfaction of the first element of the "borrowed servant" test. In its

3

introductory paragraph, the document states that "[t]he purpose of this agreement is to define the relationship between the lead driver (Hudgins) and the second seat driver or trainee (Whealton). It is intended to inform both parties and to obtain agreement of the expectations by both parties in advance." (Def. Steve Hudgins' Br. in Supp. of Mot. to Dismiss for Lack of Subject Matter Juris., Ex. B ("Expectations Agmt.")). The agreement further states as follows:

> The second seat driver is here to learn, and to advance in seat class. The lead seat will determine when training goals have been met and the second seat should be advanced in seat class. The lead seat is also expected to contact the Fleet Manager, if the second seat is having unusual difficulty or advancement is not going to occur in the normal manner.
>
> The lead seat is the supervisor on the truck and is responsible for all operational decisions. Both persons will be responsible for maintaining mutual respect for each other.
>
> If the lead seat requests that the second seat be taken off the truck, that does not mean the second seat is "fired" from Prime.
>
> No second seat will ever be left on the road, at any location, unless the Fleet Manager is involved and approves that decision. If this practice is not followed, the lead seat may not be eligible to receive second seats in the future, and may be liable for travel expenses incurred for the second seat.
>
> \*   \*   \*
>
> Second seats will not be required to drive 10-hour driving shifts until they become accustomed to resting in a moving vehicle.
>
> Driving shifts will be rotated so that second seats will not continuously drive during the late night or early morning hours.
>
> Lead seats will permit second seats to gain experience in all driving conditions. For example, lead seats will not confine second seats to driving primarily in cities or all open road or interstate.
>
> Second seats will participate in all aspects of the job, including, but not limited to: trip planning, handling of shipping documents, scaling, Qualcomm operation, preparation of Vehicle Condition Reports, backing, loading/unloading or tarping, and

4

> contact with customers.
>
> \* \* \*
>
> Both parties agree to promptly advise the Fleet Manager of any conflict between them regarding this or any other formal or informal agreement between them.
>
> The lead seat will not make any entries in the logbook of the second seat, nor will the lead seat prevent the second seat from making entries.

(Expectations Agmt.) The process for the second seat leaving the truck is set forth in the Expectations Agreement as follows:

> The Fleet Manager shall be advised and shall determine the date, location, etc.
>
> The lead seat will complete all forms certifying in writing whether or not the second seat can/should be advanced in seat class. If yes, the lead seat will certify that training has taken place in all of the areas outlined. If the person is getting off the truck for any reason other than completion of training, that should also be clearly detailed. (If the person is transferred to another unit, the next lead seat driver receiving this second seat should have the advantage of receiving all pertinent information.)

(Expectations Agmt.)

Furthermore, the Defendant avers in his affidavit that he was responsible for "paying for all services rendered by Whealton, including layover pay, loading and unloading pay, equalization pay, extra drop pay, and Whealton's FICA, FUTA and SUTA tax liabilities," as well as "the costs of Whealton's Workers' Compensation coverage." (Hudgins Aff. at ¶¶ 14-15.) In addition, the Defendant contends that his "weekly settlement from Prime was reduced in the amount of all costs and expenses for Whealton's services and benefits." (Hudgins Aff. at ¶ 16.)

In response, the Plaintiff maintains in his affidavit that he was at all times an employee solely of Prime; received paychecks, health insurance and other employment benefits from Prime; could be fired only by Prime; was paid for mileage and travel expenses by Prime; and reported to the its

Fleet Manager. (Mem. of Pl. in Opp'n to Def.'s Mot. to Dismiss for Lack of Subject Matter Juris, Ex. A (Aff. of Gerald Whealton ("Whealton Aff.") at ¶¶ 2, 6, 7, 11, 12, 14.)) He also submits for the Court's review copies of Prime payroll records for the period from October through December 2003 reflecting wages, mileage pay, travel allowances, and accommodation reimbursements made to Whealton (see Mem. of Pl. in Opp'n to Def.'s Mot. to Dismiss for Lack of Subject Matter Juris, Ex. B); earnings statements for workers' compensation payments by Prime (see Mem. of Pl. in Opp'n to Def.'s Mot. to Dismiss for Lack of Subject Matter Juris, Ex. C); and a W-2 form for 2003 from Prime (see Mem. of Pl. in Opp'n to Def.'s Mot. to Dismiss for Lack of Subject Matter Juris, Ex. E.)

In applying the factors to the facts presented herein, the Court finds that the Plaintiff has made a sufficient showing to survive the Defendant's motion to dismiss based on subject matter jurisdiction. A complete review of the Expectations Agreement reveals that it does not, as the Defendant suggests, create an employer-employee hiring relationship between Hudgins and Whealton. Rather, it is more in line with an agreement to train a new driver for the benefit of Prime, Whealton's employer. This is evidenced in particular by Hudgins' inability to fire Whealton and the ultimate control over the relationship resting in the hands of Prime's Fleet Manager. Accordingly, the first element of the "borrowed servant" test has not been satisfied. As not all of the three factors have been met, Hudgins cannot qualify as an employer for purposes of the Workers' Compensation Law's exclusivity provision.

The caselaw offered by the Defendant in support of his position, Bennett v. Mid-South Terminals Corp., 660 S.W.2d 799 (Tenn. Ct. App. 1983), is clearly distinguishable in the Court's view. In Bennett, the plaintiff was an employee of Labor Force, Inc., a supplier of temporary workers to various industrial businesses. Bennett, 660 S.W.2d at 801. The defendant requested that

Labor Force, Inc. supply temporary day laborers to assist in the loading of a barge at its terminal. Id. One of the employees supplied was Bennett. Id. In the lawsuit brought against the terminal company as a result of injuries incurred by Bennett while working on its premises, the question before the court was, as it is here, whether the plaintiff was a borrowed servant or loaned employee of the terminal operator. Id. Finding that the above mentioned factors favored the existence of a co-employer, the court stated that

> . . . it is quite clear that plaintiff consented to work for defendant and that such was pursuant to an implied contract between them. In this case plaintiff knew when he was hired by [a temporary services agency] that all of his work would actually be performed for various customers of his general employer. The very fact that he entered into an employment arrangement of that nature would constitute a general consent to work for special employers such as defendant.

Id. at 801-802 (quoting Daneck v. Meldrum Mfg. & Eng'g Co., Inc., 312 Minn. 404, 252 N.W.2d 255 (1977)) (emphasis omitted). Thus, unlike Bennett, Whealton was not the employee of a Manpower-type company in the business of farming out its employees to act as temporary workers for its customers. The evidence before the Court suggests instead that he was an employee of Prime simply paired with Hudgins for training purposes. Nothing offered by the Defendant has convinced the Court that the mere ability to instruct another individual gives rise to an employer-employee relationship.

For the reasons articulated herein, the Defendant's motion to dismiss is DENIED.

7

IT IS SO ORDERED this 24th day of October, 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

8

# UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 19 in case 2:05-CV-02234 was distributed by fax, mail, or direct printing on October 25, 2005 to the parties listed.

---

Jimmy Moore
CIRCUIT COURT, 30TH JUDICIAL DISTRICT
140 Adams Ave.
Rm. 224
Memphis, TN 38103

John Lewis Wardlaw
MARTIN TATE MORROW & MARSTON
6410 Poplar Ave.
Ste. 1000
Memphis, TN 38119

Curt Reid Soefker
MARTIN TATE MORROW & MARSTON
6410 Poplar Ave.
Ste. 1000
Memphis, TN 38119

Benjamin Lundy Daniel
DANIEL LAW FIRM
8 S. Third Street
2nd Floor
Memphis, TN 38103

Honorable J. Breen
US DISTRICT COURT